732 So.2d 692 (1999)
Jeanette A. CLOPHUS, Plaintiff-Appellant,
v.
TACO BELL CORP./HOT `N' NOW, INC., Defendant-Appellee.
No. 98-1794.
Court of Appeal of Louisiana, Third Circuit.
March 31, 1999.
*693 Louis D. Bufkin, Lake Charles, for Jeanette A. Clophus.
Jeffrey Charles Napolitano, Metairie, Mayra I. Leyva, for Taco Bell Corporation.
BEFORE: YELVERTON, WOODARD, and GREMILLION, Judges.
YELVERTON, J.
Jeanette Clophus appeals a workers' compensation judgment which denied her benefits for a mental injury. Clophus claims that an encounter with her supervisor produced the disabling injury. The workers' compensation judge found that the incident was not an "extraordinary stressful" situation so as to constitute an accident. Taco Bell answered the appeal claiming the workers' compensation judge *694 erred in failing to sanction Clophus and her attorney. We affirm.

FACTS
Clophus began working for Taco Bell on June 1, 1995, as a management trainee. Before that she had been a school teacher for several years. Clophus claims that an incident with the general manager, Morman Richard, caused her to suffer a disabling mental injury.
On January 18, 1996, Richard called Clophus into his office to talk to her. It is somewhat disputed what exactly happened at this meeting. Clophus claims that Richard started "chewing her out" about different things at work and explaining to her that maybe this job was not for her. She claims that he was yelling at her with a loud, angry tone of voice and accusing her of hiring people that had been fired. Richard, on the other hand, testified that he did not yell at her and used a normal tone of voice. He stated that employees had told him that Clophus was spending a majority of the time in the office and not helping them. Richard further stated that in the meeting he explained to Clophus that fast food was not for everyone, and that as a manager you have to perform with the crew, especially when they are busy. He did admit that he asked her if she had hired people who had already been fired, which was against company policy. Richard testified that, after the meeting, Clophus left to make a deposit but never told him she was not coming back to work.
After making the deposit, Clophus went to see Dr. Percival Kane. Dr. Kane told Clophus that she could not work, and Clophus did not return to work.

MENTAL INJURY
The workers' compensation judge found that Clophus had a history of emotional problems and that although the conversation with Richard was unpleasant for her, it did not illustrate an "accident" or "event" as the source of extraordinary stress. The workers' compensation judge specifically found that a meeting with one's boss to discuss job performance is not extraordinary.
The supreme court recently discussed the standard to be applied in reviewing factual findings in a workers' compensation case in Chaisson v. Cajun Bag & Supply Co., 97-1225, p. 8-9 (La.3/4/98); 708 So.2d 375, 380-381 (citations omitted) as follows:
Factual findings in worker's compensation cases are subject to the manifest error or clearly wrong standard of appellate review. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong.
Mental injury caused by mental stress is not compensable under the Workers' Compensation Law "unless the mental injury was the result of a sudden, unexpected, and extraordinary stress related to the employment and is demonstrated by clear and convincing evidence." La.R.S. 23:1021(7)(b).
Clophus argues that, unlike the situation in Quillin v. Calcasieu Marine Nat. Bank, 96-685 (La.App. 3 Cir. 12/11/96); 690 So.2d 802, there is evidence of stress induced by a "single triggering event" as opposed to stress induced by events over several days. Clophus further argues that, although this conversation with Richard might not have affected the reasonable person, she should be evaluated as an individual. However, as we read the workers' compensation judge's reasons for judgment, the judge regarded Clophus' meeting with Richard as a single identifiable event. She found that the event was not "extraordinary" as required by La.R.S. 23:1021(7). Therefore, we will review the case to determine whether the workers' *695 compensation judge committed manifest error in determining that this conversation did not constitute extraordinary stress related to employment.
The determination of what constitutes "extraordinary stress" is a mixed question of law and fact which must be made on a case-by-case basis. Lewis v. Beauregard Memorial Hosp., 94-318 (La. App. 3 Cir. 11/2/94); 649 So.2d 655; Henry v. Gulf Coast Cas. Ins. Co., 95-241 (La. App. 3 Cir. 1/31/96); 670 So.2d 307. This court has held that an evaluation under La.R.S. 23:1021(7)(b) focuses on the effect a particular stress might have on the particular injured employee rather than the "reasonable person" standard. Id. This court recognized that the 1989 amendments to the Workers' Compensation Law reflected an intent by the Legislature to stringently condition the award of workers' compensation benefits for mental injury or illness but that intent is satisfied by the requirement that there be a "sudden, unexpected, and extraordinary stress" proved by "clear and convincing evidence." Lewis, 649 So.2d 655.[1]
Furthermore, in Henry, 670 So.2d at 310, (citing Johnson v. Petron, Inc., 617 So.2d 1358 (La.App. 3 Cir.1993)), this court concluded that in order to establish that "extraordinary stress" was experienced, the employee must "prove merely that his physical work stress went beyond what was usual, regular or customary in relation to the average employee in that occupation."
Clophus filed this workers' compensation claim for mental stress against Taco Bell claiming that the accident occurred due to "constant, repeated harassment brought to a crescendo by termination of employment." At trial Clophus explained that the harassment consisted of verbal comments from some of the workers and managers, locking the safe and giving her the wrong combination, and basically just "constantly trying to set [her] up." She explained that the meeting with Richard was the proverbial "straw that broke the camel's back."
On appeal Clophus does not dispute that she had a history of mental problems. However, prior to trial, Clophus denied ever having any problems with stress. In her answers to questions regarding her previous work history during the deposition and in her answers to interrogatories, Clophus failed to mention that she worked for the Calcasieu Parish School Board in 1991 teaching at Cherry Street Elementary. Discovery revealed that once Clophus began teaching at Cherry Street Elementary, she started experiencing similar problems with that job. At the trial Delores Hicks, who was the principal at Cherry Street Elementary, explained that Clophus did not teach very long. Clophus could not complete the first semester because she was admitted to Charter Hospital in December for psychiatric treatment. Clophus filed a workers' compensation claim against the School Board in September 1992 alleging:
Claimant experienced pressure and work-related stress at the onset of the 1991-1992 school term because of her principal's high demands and unreasonable deadlines. Finally, by the Thanksgiving Holidays, claimant could take no more pressure. She checked herself into Charter Hospital in Lake Charles (at the urging of her family) for psychiatric attention for mental stress.
*696 In her demand letter before that suit was filed, Clophus specifically claimed:
Ms. Hicks would stalk the hallways, interrupt classes, and admonish pupils and teachers alike over the intercom system in the classrooms. Ms. Hicks set unreasonable high demands and unreasonable deadlines for the teachers. Claimant would have to stay up sometimes until the early morning hours finishing reports for Ms. Hicks.
The claim against the School Board was eventually dismissed.
It was also later revealed that after treatment at Charter, Clophus began seeing Dr. Kane for bipolar depression which he treated with lithium. Also, Dr. Kane's records indicate that the day before the conversation with Richard, Clophus called asking for nerve medication because she was stressed out.
Dr. Kane referred Clophus to Dr. Patricia Post at The Psychology Clinic on February 7, 1996. On Clophus' initial interview with Dr. Post, it was reported that:
Mood was somewhat confused and anxious due to a recent termination at Taco Bell. She was in an assistant management position and became quite stressed on several occasions, had to go into the hospital to be monitored for high blood pressure for very brief stays, although on three separate occasions.
After this interview, Dr. Post concluded that test results were consistent with the clinical interview "of some grandiosity, alienation from others, and oversensitivity and suspiciousness about her environment as well as some tendency to somatize when under stressed. There is indication of significant depression and manic features that suggest a possibility of a Bipolar Disorder that may be treated."
Subsequently, Dr. Post consulted Dr. Keith Nabours, a psychiatrist, on Clophus' case. We have Dr. Nabours' medical records in evidence, but no report from him. However, a report by Dr. Post indicates that Dr. Nabours agreed with her that there was "more than an issue of depression occurring yet whether or not this is a Bipolar Disorder or some type of schizoaffective issue remains to be seen and will take some more time to assess." A later report from Dr. Post in November 1997 establishes that Dr. Post did diagnose Clophus with schizoaffective disorder. Dr. Post also commented that "[w]hile the initial depression appeared to be induced by a stressful work environment, the current difficulties go beyond the acute stress reaction and the severe depression that she presented with initially."
Clophus was also evaluated by Dr. Rennie Culver, also a psychiatrist, at the request of Taco Bell. Dr. Culver met with Clophus on February 21, 1997. This psychiatrist then reported his findings in a fourteen-page report. In addition to meeting with Clophus, the doctor took other medical records into account in his overall assessment of the case. Dr. Culver also met with Clophus' husband for a few minutes. Dr. Culver diagnosed Clophus as paranoid schizophrenia instead of schizoaffective disorder. In expressing his opinion on her condition, Dr. Culver commented that "it is abundantly clear that this patient has been having psychiatric symptoms for years." He also thought his interview with Clophus' husband was significant in his diagnosis. Dr. Culver stated that:
[H]e [husband] seemed quite convinced that his wife was indeed the victim of less than acceptable treatment at her last place of employment. Unfortunately, this is very typical of the spouse and/or families of patients having psychotic breaks, particularly schizophrenia or bipolar illness: They find it much easier to attribute the patient's difficulties to an external agent than to something within the patient. It is not surprising, therefore, that Mr. Clophus should have indicated to me that the patient's problems all really began with her employment at Taco Bell. Significantly, however, the patient herself admitted *697 that her feelings that she was being singled out for mistreatment began in the training phase....
In summarizing her condition, Dr. Culver left no doubt what his opinion was:
In summary, Mrs. Clophus has been moving for years toward overt psychosis, her initial symptoms being anxiety, followed by depression, and ultimately by delusions and hallucinations. Even before she began her training program with Taco Bell she had some psychotic symptoms, as evidenced by the endorsement of olfactory hallucinations on the patient information form she filled out in July 1994. Two years before then her general practitioner thought she was bipolar and began to treat her for that illness. Apparently she gradually decompensated, and it is difficult to see what possible role her employment at Taco Bell could have in a process that was clearly quite advanced by the time she began the training program. She was delusional regarding the employees of Taco Bell, as there is absolutely no reason to believe that she was being victimized by any of those people for any reasons, including her race. It is obvious that while she was in training and during the time she worked in a Taco Bell restaurant she was suffering from ideas of reference as well as delusions of persecution. She did not give any account at all of anything which was unusually or inordinately stressful that could have caused her any difficulty at all. Rather, all of her complaints, it is clear from her own statements, are based upon her misperceptions of reality, distortions, and delusions. There is no reason at all to think that any of her conditions of employment at Taco Bell exacerbated, precipitated, or in any way contributed to her mental illness. Schizophrenia, whatever subtype of which she may have, is a hereditary illness. Although she denied having any family history of mental illness, and her husband said that he knew of no such history, the records I have reviewed indicated that one of her parents was adopted, so it is unlikely that a really good family history is known to this patient and her husband. Whatever information about her family may or may not be discovered, there is no question of her diagnosis, and I think it unlikely that very many physicians today believe that schizophrenia is not biological. While it is certainly true that stress may precipitate a psychotic break in a latent schizophrenic, I found nothing in the records, and the patient said nothing to me, to indicate that she was subjected to any stressors beyond the usual conditions of employment when she was at Taco Bell. The appearance of her symptoms while in the employ of that company are essentially coincidental; it is very clear that she has been gradually deteriorating for years, and it was inevitable that she eventually become overtly psychotic regardless of whether she worked for Taco Bell or anyone else, or whether she was even employed at all.
The evidence establishes that Clophus suffers from a mental disorder. However, after reviewing the testimony and medical evidence, we agree with the workers' compensation judge that Clophus has failed to prove by clear and convincing evidence that she experienced an extraordinary stress which caused her mental disorder.
This meeting concerning Clophus' job performance was not like the power outage in Lewis, 649 So.2d 655, nor like the hurricane in Henry, 670 So.2d 307. It is not unexpected on a job that an employer will discuss job performance with an employee. Although Clophus may have been more susceptible to stressful situations than the average employee due to her past problems, "an employee may not recover for mental stress or injury related to `general conditions of employment.'" Williams v. Regional Transit Authority, 546 So.2d 150, 157 (La.1989), (quoting Sparks v. Tulane Medical Center Hospital and Clinic, 546 So.2d 138, 147 *698 (La.1989)) (emphasis in Sparks opinion). As pointed out in Lewis, 649 So.2d 655, Clophus was still required to prove pursuant to La.R.S. 23:1021(7)(b) that there had been a "sudden, unexpected, and extraordinary stress," and her burden of proof was by "clear and convincing evidence." We agree with the workers' compensation judge that she failed in that burden.
The reasons for judgment indicate that the workers' compensation judge gave more credit to Richard's version of his conversation with Clophus that this was more a review of Clophus' job performance, than her version that it was an angry, unnecessary encounter. The workers' compensation judge found that this situation was unpleasant for Clophus but it was not extraordinary. Furthermore, Clophus was having problems long before her meeting with Richard. This meeting did not trigger her mental disorder. The workers' compensation judge did not err in failing to award benefits to Clophus for a mental injury.

SANCTIONS AND DISCIPLINARY ACTION
At the conclusion of the trial, Taco Bell asked the court to assign sanctions and disciplinary action for willful violation of La.Code Civ.P. art. 863 and La.R.S. 23:1208. Taco Bell specifically argues that the attorney for Clophus was the same attorney who represented Clophus for her mental stress claim against the Calcasieu Parish School Board in 1992, yet he allowed her to make false statements under oath when she denied such a claim or that she even had mental problems. Taco Bell argues that a reasonable inquiry into the attorney's own records would have revealed this prior claim and the prior treatment.
A workers' compensation judge's determination regarding the imposition of sanctions pursuant to Article 863 and application of La.R.S. 23:1208 are subject to the manifest error or clearly wrong standard of review. Collins v. Ferrellgas, Inc., 96-810 (La.App. 3 Cir. 2/5/97); 689 So.2d 569; Sumner v. Lake Charles Marine, 96-280 (La.App. 3 Cir. 6/5/96); 676 So.2d 653, writ denied, 96-1772 (La.10/11/96); 680 So.2d 645.
"Article 863 provides for sanctions for the signing of a pleading." Collins, 689 So.2d at 571. We have reviewed the answers to interrogatories and observe that in the answer to Number 21 regarding previous workers' compensation claims, the previous mental stress claim against the Calcasieu Parish School Board was included. Although this particular employment with the Calcasieu School Board was not included in the answer to Interrogatory Number 8 regarding previous employment, we find that the main concern of Taco Bell, the prior workers' compensation claim for mental stress, was included in the answers. The answers to the interrogatories did give notice of the claim.
Louisiana Revised Statute 23:1208 is an anti-fraud provision which provides for criminal penalties, civil penalties, and forfeiture of benefits when a claimant, for the purpose of obtaining benefits, makes a false statement or misrepresentation, including one concerning a prior injury, once an accident has allegedly occurred and a claim is being made. Resweber v. Haroil Const. Co., 94-2708 (La.9/5/95); 660 So.2d 7. In order for La.R.S. 23:1208 to apply, there must be (1) a false statement or representation, (2) which is willfully made, and (3) which is made for the purpose of obtaining workers' compensation benefits. Id.
While it is true that in her deposition Clophus did not mention her teaching job with the Calcasieu Parish School Board nor that she had any previous mental problems as a result of this and eventually filed a workers' compensation claim, the overall evidence does not indicate that this was a willful omission. Clophus testified that the stress she had been under had caused memory problems. Furthermore, as we have previously stated, Clophus' answers *699 to interrogatories specifically disclosed that she had a workers' compensation claim against the Calcasieu Parish School Board. The answers were provided in June 1996, and the deposition was not until October 1996. Taco Bell had sufficient notice of this claim.
It is obvious that there was no willful attempt to conceal this claim for the purpose of obtaining workers' compensation benefits. The record supports the workers' compensation judge's denial of sanctions and disciplinary action.
The judgment of the Office of Workers' Compensation is affirmed. Costs of this appeal are assessed equally to Jeanette Clophus and Taco Bell.
AFFIRMED.
NOTES
[1] We are aware that the second, fourth, and fifth circuits have chosen to apply the objective "reasonable person" test. Renter v. Willis-Knighton Medical Center, 28,589, 28,590 (La.App. 2 Cir. 8/23/96); 679 So.2d 603; Bryant v. Giani Inv. Co., 626 So.2d 390 (La. App. 4 Cir.1993), writ denied, 94-0089 (La.3/18/94); 634 So.2d 852; Jeansonne v. Wick Pub. Co., 94-462 (La.App. 5 Cir. 11/29/94); 646 So.2d 1212, writ denied, 94-2963 (La.2/3/95); 649 So.2d 405. However, we still adhere to our view that analysis should be made on a case-by-case basis and must focus on the effect a particular stress might have on the particular injured employee.